UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DEBORAH BYGUM, Administratrix of
the Estate of ERIC MITCHELL YOUNG,
deceased,

        Plaintiff,

v.                         Civil Action No. 2:19-cv-00456

The CITY OF MONTGOMERY and
ROGER L. KING, individually
as a member of the Montgomery
Police Department,

        Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is the motion for summary judgment of defendants Roger L. King and City of Montgomery, filed June 2, 2020.

I. Background

This case involves the shooting of Eric Mitchell Young ("Young") by Officer Roger L. King ("Officer King") on the morning of February 11, 2019.  Four causes of action remain in this case: Excessive use of force under 42 U.S.C. § 1983 against Officer King (Count I), battery against both Officer King and the City of Montgomery (Count II), negligence against both Officer King and the City of Montgomery (Count III), and

negligent hiring, training, and supervision against the City of
Montgomery (Count IV).[1]  See Amend. Compl., ECF No. 30.

In the early morning hours of February 11, 2019,
Officer King, an officer for the City of Montgomery Police
Department, was on night duty at the police station in
Montgomery, West Virginia, when he saw a disturbance on the
live-feed surveillance video of the alleyway behind the police
station.  King Statement 4, ECF No. 64-1.[2]  He observed Young on
the video attempting to open a locked police cruiser behind the
station; shouting obscenities, like how "he's gonna' f*ckin'
kill everybody;" and talking to himself.  Id. at 4, 7; see also
King Dep. 51, ECF No. 94-2.  He notified the police dispatcher
of Young's behavior and exited the police station to pursue
Young by foot.  See King Statement 4.

Officer King found Young in a small car shed next to
the station.  Id.  Officer King instructed Young to come over to
him, but Young walked away.  Id.  Officer King, with his taser
now out and at his side, circled the police station to try to
cut off Young at the front of the station.  Id. at 4, 8.

---

[1] The complaint also alleges three causes of action against
Officer John Michael Hess, Sr. and the City of Smithers, who
have since been dismissed with prejudice.  ECF No. 87.

[2] The King Statement is the one that was given by him to
investigating officers within hours of the event described.

Ultimately, Officer King, 6'2" and between 180 and 185 pounds, King Dep. 113, confronted Young, 5'7" and 166 pounds, Autopsy Report 2, ECF No. 94-6, in front of Montgomery City Hall, where he told Young to get onto the ground.  King Statement 4.[3]  Young told Officer King "to get the f*ck out of his face" and continued walking away with Officer King in pursuit.  Id.

During the entire pursuit, Young behaved erratically. He yelled "about Satan and the Lord;" claimed that "he was Satan . . . in like a demonic voice;" repeatedly told Officer King "to get the f*ck away from him or get the f*ck out of his face or just something" like that; and generally talked, yelled, and mumbled to himself.  Id. at 4, 9; see also King Dep. 52.  Young turned and faced Officer King several times, occasionally walking or lunging towards him.  See King Statement 5, 9; King Dep. 80, 98.  In addition, Young repeatedly flailed his arms and his shirt, which Officer King testified caused him to suspect aggression and the potential that Young could be reaching for a firearm in his waistband.  King Statement 5, 15; King Dep. 52, 61.  But Officer King never saw a weapon in Young's waistband and never saw Young wield a weapon.  King Statement 5; King Dep.

---

[3] Defendants submitted surveillance footage that allegedly captures the encounter from this point forward.  See ECF Nos. 64-4, 74.  For purposes of summary judgment, the court finds the video of no value because of its poor quality.

40-41.[4]  Officer King repeatedly commanded Young to get on the ground, but Young refused.  King Statement 5, 15.

During one of Young's advances, Officer King fired his taser.  Id. at 5, 8-9; King Dep. 43, 52-53.  Although Officer King believed he hit Young in the chest, Young pulled the taser prongs from his body and seemed unaffected.  King Statement 5, 9, 15; King Dep. 43, 53, 97.  Officer King testified that this caused him to believe that Young was under the influence of a substance that was blocking his pain receptors.  King Dep. 43, 53, 73; see King Statement 15.  However, Officer King could not confirm that the taser prongs actually connected with Young's skin or whether the taser simply malfunctioned.  King Dep. 53. Indeed, the autopsy report does not note any markings consistent with taser wounds.  See Autopsy Report.  Officer King notified the police dispatcher about the taser's ineffectiveness and continued following Young from a distance.  King Statement 5.

After firing his taser, Officer King drew his firearm with mounted flashlight in one hand while still carrying the taser in the other.  King Statement 9-10; King Dep. 63.  Even though the taser did not have another cartridge to fire, Officer

---

[4] Young had an unopened pocketknife on his person, clipped to his pocket, of which Officer King was unaware until after the shooting.  King Statement 12

4

King still threatened to tase Young to convince him to get on the ground.  King Statement 5, 16.  Young did not comply.  <u>Id.</u> at 5.  The pursuit ended when Officer King fired five bullets at Young, four of which hit and killed Young.  <u>Id.</u> at 5-6; King Dep. 107.  The parties dispute the circumstances surrounding the shooting.

Officer King testified that Young stood about 20 feet away when Young turned to face him.  King Dep. 81.  According to Officer King:

> And I told him, I said, man, just get down on the ground, please.  I'm . . . I'm begging you to get down on the ground.  And he keeps telling me something about they all hate him or something.  I told him, I said, we'll work this out.  We'll figure this out. And that's when he started yelling at me and like just his whole entire demeanor just changed and that's whenever he charged at me and . . . I shot him.

King Statement 5 (ellipses in original); <u>see also id.</u> at 13, 15; King Dep. 52, 63, 80, 106-07.  Officer King also recalled that Young kept saying "just shoot me."  King Statement 11.  Officer King stated that he was concerned he could fall and lose his firearm if he backpedaled because there was a curb behind him, and that he feared for his life, so he opened fire when Young had closed the distance to approximately 8 to 10 feet.  <u>See id.</u> at 11, 15; King Dep. 40, 64, 79-80.

Specifically in regards to the respective positions of Officer King and Young during the shooting, Officer King's

statement taken a few hours after the shooting provides the

following account:

> Q: Do you know how many times you shot?
>
> A: I thought I shot him four.  I thought three or four
> times.  I can't remember.
>
> Q: Ok.
>
> A: It didn't stop him.
>
> Q: He kept coming after you shot?
>
> A: I shot twice, I remember, and he just kept coming
> and then he turned around and he turned around again
> and that's when I thought he was gonna' reach or
> something and I shot one more and that's when he fell.
> [inaudible] . . . he fell, I went to roll him over and
> tried to help.
>
> . . .
>
> A: . . . When he fell, he fell on his . . . he fell on
> his . . . on his back and he was . . . his legs was
> facing towards Kanawha side and his head was my way.

King Statement at 5-6, 11.


At his deposition a year later, Officer King testified

that Young when shot "walked a good distance" and then

collapsed:

> All shots were fired when [Young] was charging . . . .
>
> . . .
>
> Once I shot, he stood completely straight up, turned
> completely around away from me, and walked a good
> distance.  And then that's when he collapsed against
> the fence line.

King Dep. 106-07.

6

Plaintiff's expert forensic reconstructionist, Jeremy J. Bauer, Ph.D., disagrees with Officer King's account.[5]  In reconstructing the shooting, Dr. Bauer considered, inter alia, the location of bullet casings ejected from Officer King's firearm that fixed his location in the middle of the street when he fired the shots, the location and entry angles of Young's bullet wounds, the location of two bullets that struck the house behind Young, Young's location and position of rest, and Officer King's investigatory statement taken within hours of the shooting and his deposition testimony from this case taken slightly over one year later.  See Bauer Report 2-5, ECF No. 64-4; Bauer Suppl. Report 1-3, ECF No. 94-3.

From that information, Dr. Bauer reconstructed the shooting to determine Young's body positioning and the respective positions of Officer King and Young during the shooting.  See Bauer Suppl. Report 5, Fig. 4 (visualization of reconstruction).  First, with respect to Young's body positioning during the shooting, Dr. Bauer found that one bullet's path struck Young from the front while he was standing

---

[5] Defendants insist that Dr. Bauer's opinions as they relate to the distance between Officer King and Young during the shooting are inadmissible and thus cannot be considered by the court. Defs. Reply 8, ECF No. 96.  Defendants also moved for an order in limine to that effect.  See ECF No. 97.  The court disagrees and will deny defendants' motion in limine in a separate order.

upright and that the paths of the remaining three that struck him "progressed from [Young's] left to his right" and "traveled downward and to the left."  Id. at 4; see also id. at 4, Fig. 3. "Therefore," Dr. Bauer stated, "Mr. Young was rotat[ing] to his right with respect to Officer King when he was struck with" the last three bullets.  Id.; see also id. at 5, Fig. 4.  Dr. Bauer reasoned that this "directional consistency is demonstrative of shots that were fired around the same time as the body being struck was rotating and falling," with the frontal bullet fired first and the remaining three fired in succession.  See id. at 4; see also id. at 5, Fig. 4.  Dr. Bauer believed that the rotation of Young's body is consistent with Officer King's statement that Young fell on his back and died with his head facing Officer King.  See id. at 6; see also King Statement 11.

Second, Dr. Bauer considered Officer King's location during the shooting.  Dr. Bauer found that one of the "bullet[s] that struck the front of the house [behind Young] also likely passed through Mr. Young."  Bauer Suppl. Report 4.  "The bullet path most consistent with" that shot is the path of the first bullet that struck Young from the front while he was standing upright.  See id.; see also id. at 5, Fig. 4.  And "[t]o produce this bullet path Officer King would have been standing near where the east-most bullet casing was found, approximately 50

feet from Mr. Young at the time the bullet was fired." Id. at
4; see also id. at 5, Fig. 4 and Fig. 4 caption. With Officer
King firing the first bullet at the site of the easternmost
casing 50 feet from Young's location of rest, Dr. Bauer found
that the bullet paths of Young's three remaining wounds, which
were sustained in progression, correspond with the locations of
the remaining bullet casings advancing from east to west. See
id. at 4; see also id. at 5, Fig. 4 and Fig. 4 caption. Thus,
Dr. Bauer found that Officer King fired his weapon while
"mov[ing] in an east-west direction," firing the first bullet 50
feet from Young and the last bullet "likely 25 feet from Mr.
Young." See id. at 4-5; see also id. at 5, Fig. 4.

     Third, turning to Young's location during the
shooting, Dr. Bauer credited Officer King's statement given
within hours of the shooting, where Officer King suggested that
Young fell and died at his location of rest after the last shot.
Id. at 4 (citing King Statement 6). Dr. Bauer marked Young's
location of rest at the same spot Officer King located Young's
resting spot. Compare id. at 5, Fig. 4, with King Dep. 134-38
(referencing Ex. 6 to King Dep., last page of ECF No. 94-2).
Moreover, Dr. Bauer opined that a relatively stationary Young
falling at his location of rest is consistent with the bullet
and wound evidence described above. See id. at 4; see also id.

at 5, Fig. 4.  In other words, Dr. Bauer opined that Young stood

relatively stationary while Officer King opened fire 50 feet

away and continued firing while advancing to 25 feet from Young.

See id. 4-6; see also id. at 5, Fig. 4.

Thus, Dr. Bauer concludes as follows, in relevant

part:

> 1) Mr. Young was between 25-50' away from Officer King
> when each of the four bullets struck him, inconsistent
> with Officer King's statement claiming he was 8 feet
> away [from] Mr. Young when he fired at Mr. Young;
>
> 2) Mr. Young was likely 50 feet away from Officer King
> and facing Officer King when Mr. Young was shot in the
> left side of his chest;
>
> 3) Mr. Young was standing on the corner of 3rd Ave.
> and Jefferson St. and rotating to his right with
> respect to Officer King, when the remaining 3 bullets
> struck Mr. Young.  The evidence is inconsistent with
> Mr. Young actively charging toward Officer King when
> Mr. Young was shot . . . .

Id. at 6.

The report and Dr. Bauer's testimony further detail

that while Young was not running or charging at Officer King,

Dr. Bauer "[cannot] eliminate whether or not [Young] was moving

forward or walking backward."  Bauer Dep. 30, ECF No. 116-6.

Dr. Bauer opines that Officer King, on the other hand, advanced

on Young in an approximate 42-foot leftward arc, firing the

first shot from about 50 feet away and the last shot from about

25 feet away.  <u>See</u> Bauer Suppl. Report at 5, Fig. 4; <u>see</u> <u>also</u>
<u>id.</u> at 4-6; Bauer Report 10, Fig. 9.

Now, defendants move for summary judgment on all
counts.

## II. Standard of Review

Summary judgment is appropriate only "if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to
establish the elements of a party's cause of action.  <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see</u> <u>also</u> <u>News</u>
<u>& Observer Publ'g Co. v. Raleigh-Durham Airport Auth.</u>, 597 F.3d
570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact
exists if, in viewing the record and all reasonable inferences
drawn therefrom in a light most favorable to the non-moving
party, a reasonable fact-finder could return a verdict for the
non-moving party.  <u>Anderson</u>, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts
. . . must be viewed in the light most favorable to the party
opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S.
654, 655 (1962).  A party is entitled to summary judgment if the

record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

### III. Discussion

#### A. Section 1983 -- Excessive force

Qualified immunity is an affirmative defense which "balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Qualified immunity "protects from liability officers who commit constitutional violations, but whose conduct does not violate clearly established statutory or constitutional rights known to a reasonable person."  Wilson v. Prince George's County, 893 F.3d 213, 219 (4th Cir 2018).  "The burden of proving qualified immunity rests on the party seeking to invoke it."  Id.

The court applies a two-pronged approach to assess whether an officer is entitled to qualified immunity.  Id. (citing Saucier v. Katz, 533 U.S. 194 (2001), and Pearson, 555 U.S. 223).  First, the court determines "whether the facts alleged or shown, taken in the light most favorable to the plaintiff, establish that the officer's conduct violated the plaintiff's constitutional right."  Id. (quoting Saucier, 533 U.S. at 201).  If the court finds a violation of the plaintiff's constitutional right, the court must determine whether that right was "clearly established" at the time of the incident. Id. (quoting Saucier, 533 U.S. at 201).  In this case, Officer King argues that he is entitled to summary judgment under both qualified immunity prongs.

> ### 1. Prong one -- Whether Officer King's conduct
> ### violated the Fourth Amendment

The court first considers whether the facts, viewed in the light most favorable to plaintiff, show that Officer King violated Young's right to be free from excessive force under the Fourth Amendment.  See Graham v. Connor, 490 U.S. 386, 394-95 (1989) (finding that Fourth Amendment confers right of free citizens to be free from excessive force "in the context of an arrest or investigatory stop").  Officer King's use of force is evaluated under an "objective reasonableness" standard.  Wilson

**v. Prince George's County**, 893 F.3d at 219.  Applying that standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting arrest or attempting to evade arrest by flight."  **Gray-Hopkins v. Prince George's County**, 309 F.3d 224, 231 (4th Cir. 2002) (quoting **Graham**, 490 U.S. at 396); **see also Tennessee v. Garner**, 471 U.S. 1, 8-9 (1985) (directing courts to consider the "totality of the circumstances").  The court must take the viewpoint "of a reasonable officer on the scene, and the use of hindsight must be avoided."  **Id.** (citing **Garner**, 471 U.S. at 8-9).

In this case, Officer King indisputably used lethal or deadly force.  The Fourth Circuit recounts as follows regarding lethal force:

> The "intrusiveness of a seizure by means of deadly force is unmatched," and a police officer may only employ such force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." If an individual "poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."

**Streater v. Wilson**, 565 F. App'x 208, 211 (4th Cir. 2014) (quoting **Garner**, 471 U.S. at 9, 11).

The parties dispute the facts surrounding Officer King's lethal shooting of Young, particularly in regards to the respective positions of Officer King and Young as detailed above.  But viewing the facts in plaintiff's favor reveals that Officer King, who was noticeably larger than Young, opened fire while Young was 50 feet away, stationary, not wielding a weapon, and not known to be carrying a weapon.  He then fired four more bullets while advancing 42 feet in a leftward arc towards Young, firing the last bullet 25 feet away from Young.  Young began to fall to the ground after the first shot.  Officer King had probable cause to believe Young had committed several non-violent misdemeanors that night, see King Dep. 82-83 (testifying that all suspected crimes were non-violent misdemeanors), see also id. at 74 (stating he did not know who Young was otherwise), and that Young was attempting to evade arrest by flight.  There is no evidence that anyone else was in the area at the time.

Applying the objective reasonableness standard to the material "facts and circumstances of [this] particular case," Gray-Hopkins, 309 F.3d at 231, a reasonable jury could readily conclude that Officer King employed objectively excessive force in violation of the Fourth Amendment.  It could be found that Young was standing still 50 feet away from Officer King; was

15

emptyhanded; was noticeably smaller than Officer King; and posed no threat to Officer King or others.  Officer King nevertheless opened fire and continued firing as he advanced to a position 25 feet from Young, while Young was falling to the ground.  By comparison, the Fourth Circuit has found that an officer's use of lethal force was objectively unreasonable when the officer shot an armed but nonthreatening suspect 20 feet away -- closer than when Officer King stopped shooting the unarmed and nonthreatening Young.  See Wilson v. Prince George's County, 893 F.3d at 220 ("A jury could determine that [the plaintiff], standing 20 feet away and armed only with a pocket knife that he was using solely against himself, did not pose an immediate threat to [the defendant officer] or others, thereby rendering [the defendant officer's] use of lethal force unreasonable.").

Officer King's arguments to the contrary are unavailing at this stage.  Indeed, the factual underpinning for nearly all of Officer King's arguments is that Young charged at Officer King, approaching him within 8 feet.  See Defs. Mem. Supp. 5-8, ECF No. 64; Defs. Reply 10-13.  A jury may accept that as true at trial; the court cannot on defendants' summary judgment motion.

Otherwise, Officer King contends that some of the crimes allegedly committed by Young were "major" rather than

"minor," Defs. Reply 9, and that "Young was actively resisting arrest by fleeing," Defs. Mem. Supp. 6.  But these contentions, even assumed true, are greatly outweighed by facts found by Dr. Bauer that Young was 50 feet away, stationary, and posing no threat to King or others when King opened fire.  Moreover, neither the totality of Young's flight nor the non-violent nature of Young's suspected offenses suggested an objective need for lethal force.  Accordingly, under these circumstances, a reasonable jury could find that Officer King's use of lethal force violated the Fourth Amendment.

> ### 2. Prong two -- Whether Young's Fourth Amendment right was clearly established

"A right is 'clearly established' if it would be clear to a reasonable officer that the alleged conduct is unlawful." Wilson v. Prince George's County, 893 F.3d at 221 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Specifically, "the contours of the right must be 'sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right.'"  Id. (internal quotation marks omitted and alteration in original) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  The contours of a right become clear when an issue has "been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the

17

highest court of the state." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (quoting Wallace v. King, 626 F.2d 1157, 1161 (4th Cir. 1980)). "[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." Id. (citing cases).

At the outset, this case possibly presents a rare scenario where, having viewed the facts most favorably to plaintiff, the more "general rules articulated in Graham and Garner" clearly establish Young's right. Wilson v. Prince George's County, 893 F.3d at 222 (citations partially omitted); accord White v. Pauly, 137 S. Ct. 548, 552 (2017) ("Garner and Graham do not by themselves create clearly established law outside an obvious case." (quotation marks omitted)). Relevant here, Garner discussed the general principle that an officer may not use lethal force against a "suspect [who] poses no immediate threat to the officer and no threat to others." 471 U.S. at 11. An empty-handed, stationary, and isolated Young would present such a nonthreatening suspect. See Clem v. Corbeau, 284 F.3d 543, 553-54 (4th Cir. 2002) (finding it obvious that an officer's use of lethal force was unreasonable where the suspect was nondangerous because he was "unarmed, blinded, and

stumbling, in no condition to pose any threat to the officer");
Wilson v. Prince George's County, 893 F.3d at 220 (denying
qualified immunity where a police officer shot a suspect who was
"standing 20 feet away and armed only with a pocket knife that
he was using solely against himself[ and] did not pose an
immediate threat to [the officer] or others"); Gray-Hopkins, 309
F.3d at 231 (denying qualified immunity where a police officer
shot dead a suspect who "was standing still with his hands
raised over his head at the time of the fatal shot, . . . was
not resisting arrest, and . . . was not posing a threat to the
safety of the officers or others"); Streater, 565 F. App'x at
212 (denying qualified immunity where a police officer shot dead
a suspect who "was neither approaching nor threatening the
officers or civilians . . . and was not a suspect in [a violent
crime]").

Again, it bears repeating: viewing the facts most
favorably to plaintiff, Young was 50 feet away, stationary, and
posing no immediate threat to King or others when King opened
fire, advanced on Young, and continued shooting while Young fell
to the ground.  Under those circumstances, Young's right to be
free from the use of lethal force was clearly established.

Officer King draws unconvincing comparisons to an
unpublished Fourth Circuit decision where the officer was found

to have reasonably tased, not shot, a fleeing, mentally ill suspect, <u>see</u> <u>Thomas v. Holly</u>, 533 F. App'x 208 (4th Cir. 2013), and to a per curiam Supreme Court decision where an officer was found to have reasonably shot a woman known to be dangerous wielding a kitchen knife within striking distance of another person, <u>see</u> <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1153-54 (2018) (per curiam).  Defs. Mem. Supp. 10-12.  Those decisions are not comparable to this case.

Accordingly, in view of the genuine dispute as to the material facts respecting the shooting of Young, the court finds that Officer King is not at this juncture entitled to qualified immunity with respect to plaintiff's § 1983 claim for excessive force in violation of the Fourth Amendment.

B. Vicarious liability

Plaintiff alleges in the amended complaint that the City of Montgomery is vicariously liable for the tortious conduct of Officer King, under theories of battery (Count II) and of negligence (Count III).  <u>See</u> Amend. Compl. at ¶¶ 91, 98.[6]

---

[6] In seeking summary judgment on the vicarious liability claims, defendants simply incorporate their motion to dismiss on the same matter, Defs. Mem. Supp. 12 (citing ECF No. 38), which the court denied without prejudice, ECF No. 61.  Likewise, plaintiff

Defendants chiefly argue, in relation to vicarious liability for the battery claim, that West Virginia law has not waived immunity as it relates to intentional torts.  Section 29-12A-4(b)(1) of the West Virginia Code makes clear that "[e]xcept as provided in subsection (c), a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of . . . an employee of the political subdivision in connection with a governmental or proprietary function."  The West Virginia Supreme Court of Appeals has clarified that this "general grant of immunity" for political subdivisions includes both intentional and unintentional acts.  <u>Zirkle v. Elkins Road Public Service Dist.</u>, 655 S.E.2d 155, 160 (W. Va. 2007).

Subsection (c)(2) waives this immunity in relation to injuries "caused by the negligent performance of acts by [municipal] employees while acting within the scope of employment."  Plaintiff argues that the court ought to look past the formal "intentional label" in determining whether liability is waived, citing the federal district court opinion of <u>Conklin v. Jefferson Cnty. Bd. Of Educ.</u>, 205 F. Supp. 3d 797, 818 (N.D. W. Va. 2016).

---

simply incorporates her response to the motion to dismiss.  Pl. Resp. 22 (citing ECF No. 40).

In Mallamo v. Town of Rivesville, the Supreme Court of Appeals of West Virginia held that a police officer's alleged participation in a conspiracy to conceal facts concerning a shooting could not be a basis for liability because "conspiracy is an intentional act, not a negligent one, [and] the [municipality] would not be liable for any intentional malfeasance on the part of [the officer]."  477 S.E.2d 525, 533-34 (W. Va. 1996).  In arriving at that conclusion, the court emphasized that the legal definition of conspiracy involved concerted action.  Id.

Nor is Conklin to the contrary.  The court in Conklin held that the common-law claim for intentional infliction of emotional distress does not necessarily require an intentional act despite its label.  See 205 F. Supp. 3d at 818.  In other words, the court's holding was based on the fact that, despite the name of the cause of action, the elements of intentional infliction of emotional distress can be met by showing the defendant acted with something less than intent, like recklessness.  See id.

Thus, the inquiry is whether a battery is necessarily an intentional act.  The West Virginia Supreme Court of Appeals has expressly held that "[i]n order to be liable for a battery, an actor must act with the intention of causing a harmful or

offensive contact with a person." Syl. Pt. 8, W. Va. Fire & Cas. Co. v. Stanley, 602 S.E.2d 483 (W. Va. 2004). Inasmuch as battery requires an intentional act, the City of Montgomery is immune from vicarious liability for Officer King's alleged battery.

Turning to vicarious liability of the City of Montgomery for negligence, West Virginia Code § 29-12A-5 provides for specific instances where a municipality retains immunity even if the claim arises out of the negligence of its employee acting within the scope of his employment. See W. Va. Code § 29-12A-4(c) (stating that the waiver of general immunity is "[s]ubject to section[] 5 . . . of this article"). Relevant here, section 29-12A-5(a)(5) provides that a municipality "is immune from liability if a loss or claim results from . . . the failure to provide, or the method of providing, police, law enforcement or fire protection."

The Supreme Court of Appeals explains that "'the method of providing police, law enforcement or fire protection' [under section 29-12A-5(a)(5)] refers to the decision-making or the planning process in developing a governmental policy, including how that policy is to be performed." Syl. Pt. 4, Smith v. Burdette, 566 S.E.2d 614 (W. Va. 2002), overruled on other grounds by Albert v. City of Wheeling, 792 S.E.2d 628 (W.

Va. 2016).   The Supreme Court of Appeals further explains that section 29-12A-5(a)(5) immunity extends to negligent acts taken within the scope of employment, so long as the act taken was in carrying out or in furtherance of a governmental policy.   See Syl. Pt. 4, Albert, 792 S.E.2d 628; see also Syl. Pt. 4, Beckley v. Crabtree, 428 S.E.2d 317 (W. Va. 1993) ("Resolution of the issue of whether a loss or claim occurs as a result of 'the method of providing police, law enforcement or fire protection' requires determining whether the allegedly negligent act resulted from the manner in which a formulated policy regarding such protection was implemented.").

Defendants argue that the City of Montgomery is immune from vicarious liability for Officer King's alleged negligence because the negligence claim arises out of "the method of providing" police protection under section 29-12A-5(a)(5).   ECF No. 38 at 5-6.   "[D]uring the course of engaging in police protection," defendants reason, "an incident occurred resulting in damage to [Young]."   Id. at 6.   Plaintiff responds that "[section] 29-12A-5(a)(5) applies strictly to 'policy' decisions," and "Young's death was not the result of the implementation of a formulated Montgomery Policy Department

24

policy related to how police protection is to be provided."  ECF No. 40 at 5.[7]

Defendants read "method of providing police . . . protection" too broadly.  Instead, as plaintiffs contend, the focus of the analysis is on "whether the allegedly negligent act resulted from the manner in which a formulated policy regarding such protection was implemented."  Syl. Pt. 4, Crabtree, 428 S.E.2d 317.  For instance, in Albert, the Supreme Court of Appeals found that section 29-12A-5(a)(5) barred a claim against a city for a "negligent failure . . . to maintain, inspect and otherwise keep its waterworks and fire hydrant system fully operable."  792 S.E.2d at 632-33.  In doing so, the Supreme Court of Appeals cautioned against "attempt[s] to separate the provision of water services necessary to battle fires from the firefighting itself."  Id. at 634.  Indeed, the Supreme Court of Appeals in Albert rejected the plaintiff's attempt to recast her claim for negligent maintenance of a fire hydrant's water supply as negligent firefighting itself.  See id. at 633.

---

[7] The court notes that the Supreme Court of Appeals occasionally analyzes section 29-12A-5(a)(5) through the lens of the public duty doctrine, which is a common-law doctrine applicable to claims against political subdivisions.  See generally Bowden v. Monroe Cnty. Comm'n, 800 S.E.2d 252 (W. Va. 2017).  Neither party raises the public duty doctrine issue here, so the court does not address it and instead proceeds with a statutory analysis.

The reasoning in __Albert__ applies equally to the policing context.  Plaintiff's negligence claim goes to "[policing] itself," rather than the governmental policy for "the provision of [police] services necessary to [respond to suspected crimes]."  __Id.__  Plaintiff's negligence claim against Officer King is not for damages caused by negligence in carrying out some governmental policy of the City of Montgomery. Instead, plaintiff claims that Officer King was negligent in carrying out his discretionary actions in policing when he shot Young.  The Supreme Court of Appeal's explication in __Mallamo__ of the distinction between carrying out governmental policy and individual negligence of police officers and fire fighters is instructive:

> [The method of providing police or fire protection] is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options.  Accordingly, a city is immunized from such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased.  We do not believe [the applicable statute] is so broad as to immunize a city on every aspect of negligent police and fire department operations.  Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.

*Mallamo*, 477 S.E.2d at 626 (quoting *Jackson v. City of Kansas City*, 680 P.2d 877, 890 (Kan. 1984)).  Thus, the City of Montgomery is not immune from vicarious liability for the alleged negligence of Officer King.

    C. Negligent hiring, training, and supervision

      Plaintiff's Count IV alleges that the City of Montgomery negligently hired, trained, and supervised Officer King.[8]  Under West Virginia law, to recover under a theory of negligent training or supervision, a plaintiff must show that, "[the municipality] failed to properly [train or] supervise an employee officer and, as a result, the employee officer proximately caused injury to the plaintiff." *Woods v. Town of Danville*, 712 F. Supp. 2d 502, 515 (S.D. W. Va. 2010) (citing *Taylor v. Cabell Huntington Hosp., Inc.*, 538 S.E.2d 719 (W. Va. 2000)).  Negligent training and supervision (and hiring, had it survived) are founded on traditional negligence principles of breach of a duty and proximate causation of damages.  See *id.* at

---

[8] **Plaintiff appears to have dropped the claim of negligent hiring, as it did not make any arguments to that effect in its response to the motion for summary judgment.  Thus, defendants are entitled to summary judgment to the extent Count IV involves negligent hiring.**

515.  Defendants contend that plaintiff has no evidence to support a finding of negligent training or supervision.

Plaintiff's theory of negligent training and supervision is that the Montgomery Police Department does not test its officers on department policies or procedures.  This was evidenced by the 30(b)(6) deposition of Chief of the Montgomery Police Department, who testified that the department does not test its officers.  Workman Dep. 18:1-24, ECF No. 94-7.  Officer King also testified that when he was hired, he was given the policies and procedures "to take home, and [review]."  King Dep. 25:13-26:4.

Plaintiff provides no evidence or case law to arrive at an applicable standard of care or duty owed by the Montgomery Police Department.  It is insufficient to merely assert that "a jury could conclude that Officer King's lack of knowledge of Montgomery PD policies and procedures . . . proximately caused Mr. Young's death," Pls.' Resp. 23, without setting out a prima facie case for negligence.  Furthermore, plaintiff has adduced no evidence to causally link a lack of testing to Young's death.  It is not enough baldly to say that lack of testing is, ipso facto, negligent training or supervision.  See Restatement (Second) of Torts § 433B cmt. a (Am. Law Inst. 1965).  Thus,

summary judgment in favor of the City of Montgomery is warranted as to Count IV.

### D. Battery and negligence

Under West Virginia law, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." <u>Tolliver v. Kroger Co.</u>, 201 W. Va. 509, 518 (1997).  Whether Officer King's conduct amounted to a battery under the definition in West Virginia law is an issue of disputed material fact.

Defendants argue that Officer King is entitled to immunity under West Virginia Code § 29-12A-5(b), which establishes immunity for employees of political subdivisions, except where one of three exceptions apply: "(1) His or her acts or omissions were manifestly outside the scope of employment or official responsibilities; (2) His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) Liability is expressly imposed upon the employee by a provision of this code."  Defendants argue that plaintiff

has failed to produce evidence that any of the above exceptions apply.

Plaintiff argues that Officer King is liable insofar as his conduct was done "with malicious purpose, in bad faith, or in a wanton or reckless manner." Wanton or reckless behavior under West Virginia law means that the person "has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Holsten v. Massey, 490 S.E.2d 864, 878 (W. Va. 1997). A reasonable jury could conclude on the evidence in the record that Officer King's conduct crossed the threshold into wantonness or recklessness, thus invoking the exception to immunity contained in § 29-12A-5(b)(2). Thus, summary judgment in favor of Officer King is not warranted as to Counts II and III.

## IV. Conclusion

For the foregoing reasons, it is ORDERED that defendants Roger L. King and City of Montgomery's motion for summary judgment be, and hereby is, granted as to Count II (battery) and Count IV (negligent supervision) as against the City of Montgomery, denied as to Count III (negligence) as

against the City of Montgomery, and denied as to all Counts as
it relates to Officer King.

The Clerk is directed to transmit this memorandum
opinion and order to all counsel of record.

ENTER: September 30, 2021


John T. Copenhaver, Jr.
Senior United States District Judge